## THE AMERICAN BONDING CO. *vs.* THE PROGRESSIVE PERMANENT BUILDING LOAN AND SAVINGS ASSOCIATION.

*Bond Conditioned for Completion at Specified Time of Houses Subject to a Mortgage—Release of Some of the Houses After Default—Liability of Obligor.*

A bond given to the mortgagee of property conditioned for the completion within a designated time of houses being erected on the land is not a guaranty of the mortgage debt, but an agreement to indemnify against loss to the mortgage arising from the non-completion of the houses at the time specified.

After a breach of the condition of such bond, a release of part of the property from the mortgage does not relieve the obligor from liability when he suffers no loss by such release.

A mortgage of nineteen lots of ground, upon which houses were being erected, was assigned to the plaintiff by one W, and at the same time the defendant executed to plaintiff a bond conditioned for the completion of the houses by W on or before July 1st An independent agreement between W and the plaintiff provided that upon payment of one nineteenth of the mortgage debt the plaintiff would release any lot, but the defendant was not notified of this agreement. The bond was procured · from the defendant by W and not by the plaintiff. The houses were not finished by July 1st. At different times, beginning four months after that date, the plaintiff released nine of the lots from the operation of the mortgage—the houses being still incomplete. The money paid for the releases was credited on the mortgage debt, and the proceeds of the sales of the released lots were used by W. in work on the other houses. Upon foreclosure of the mortgage there was a deficit, and the plaintiff brought this action on the bond. The evidence established that the houses could have been sold for a larger amount, and enough to discharge the mortgage, if they had been completed by July 1st, and that the defendant had not been injured by the releases. *Held*, that the bond sued on was not a guaranty of the mortgage debt but a stipulation that the houses should be completed by July 1st, and since it is shown that the plaintiff sustained a loss by reason of their non-completion, he is entitled to recover.

*Held*, further, that the release of some of the lots from the mortgage, after default on the bond, did not relieve the defendant from liability under the circumstances of this case.

Appeal from the Court of Common Pleas (STOCKBRIDGE, J.)

The cause was argued before MCSHERRY, C. J., FOWLER, BRISCOE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*Edward Duffy* (with whom were *Bond & Robinson* on the brief), for the appellant.

The Bonding Company is the guarantor of the mortgage debt of Wade to the Building Association; not an absolute guarantor, however, but only a conditional—that is, it is a guarantor only to the extent of the penalty of the bond, in this case $3,500, and only if the buildings are not completed within the specified time. *American Building Assoc.* v. *Waleen*, 52 Minn. 23; *Johnson* v. *Cook*, 64 Pac. Rep. (Wash.) · 729.

That it was intended to be nothing but a guaranty of the mortgage debt, is shown by the face of the bond. The bond is not given for the performance of a building contract, for the obligor was not engaged in building the houses. Carter was the builder and Wade was advancing him money for building purposes, therefore, there was really no way in which Wade could perform the condition of the bond. Then again, the recital in effect says that it is given to protect the appellee against loss by reason of its loan. Both by legal construction and the intention of the parties this bond is a conditional guaranty of the mortgage debt.

The agreement to release lots was not known by the Bonding Company, and was never communicated to it by either Wade or the appellee. The appellee's attorney was told to prepare a bond suitable to him and it would be executed. He prepared the bond, which in its recitals refers only to the mortgage, never a word about the outside agreement, which is neither referred to in the bond nor the mortgage. Presumably the appellant knew that if the houses were all completed it could not suffer loss, for by the testimony there would have been at least $10,000 worth of security for the debt of $3,500, and it had the right to assume that if only the five houses on Federal street were completed, it could suffer no loss, for they would be worth $3,500, and yet under the real transaction, it would suffer loss unless every one of the houses were completed. The appellant had the right to assume that when a seven hundred dollar house was completed its liability was reduced by that amount, and yet, as a matter of fact, it was only reduced by $170. The fact that this agreement was not communicated to the appellant was a legal fraud upon it, and, therefore, released it from its obligation on the bond. *Pidcock* v. *Bishop*, 3 Barn. & Cr. 605; *Stone* v. *Compton*, 5 Bing. N. S. 142; *Peck* v. *Durett*, 9 Dana, 486.

We are not here complaining that Wade gave us no information as to the agreement, for we cannot hold the obligee responsible for that. We are complaining of the misinformation given us by the obligee. The recitals in the bond can

have but one meaning, and that is, that as security for the loan Wade has conveyed the nineteen lots by mortgage of even date with the bond. We turn to the mortgage and find that is correct. Two years afterwards we discover, however, the outside agreement under which, at the option of the mortgagor, each lot may be security for $170 only, and at the final wind-up we find the nine most valuable lots, and even these not equally valuable, released each for one-nineteenth of the debt, and the ten least valuable lots held as security for the balance. It is the misleading statements in the bond which are at law a fraud on the Bonding Company and should release it from its obligation.

Really this question lies at the root of this case, for if we are bound by the agreement, then the releases were rightfully made and we have no right to complain of them. It would therefore seem that there is nothing else to discuss in this case. Had this agreement not been proved there would, on the contrary, be a good deal to discuss, for clearly under such circumstances, the Court would have committed error in granting the appellee's second and third prayers. We have seen that an obligee has the right to exchange collateral held by him, provided, he gets as much as he surrenders. In this case, however, Wade was under no obligation to put back into the uncompleted houses the money he received upon remortgaging the separate pieces of property released. It, therefore, follows that when the appellee released the first house worth $700, it released the Bonding Company to the extent of $700. The mere fact that Wade voluntarily thereafter spent more than $700 in the other houses cannot have the effect of cancelling the release of the appellant to the extent of $700, for this release had already been perfected, and so when the second house was released the appellant was again released at least to the extent of the amount received from the new mortgage, and when all nine had been released the appellant was released entirely, for the nine were worth the full amount of the mortgage debt.

*Edward C. Carrington, Jr.*, and *Wm. Ewin Bonn*, for the appellee.

The issues submitted to the jury, the following questions of fact:

Did the releasing the property mentioned in the pleas injure the defendant or cause any loss to it and were such releases made after default had occurred in the bond and after July 1st, 1899?

Did the releasing of the property enable Carter and Wade to procure funds with which to assist them in completing the other properties in said assignment of mortgage, not at the time completed and was the money derived from the property so released (after paying the expenses on said property and making partial payments on the mortgage debt) applied by Carter and Wade towards the building and completion of the houses on the lots, not at the time completed and did the releases made by the plaintiff injure the defendant or save it from greater loss and liability on its bond?

. Were the releases made in accordance with an agreement between plaintiff and Wade, entered into as a condition precedent to the loan and assignment of mortgage and entered into before the execution of the bond, or was the agreement made after the execution of the bond and before July 1st, 1899?

. The plaintiff having established its loss under its mortgage by means of the auditor's account in the case in which the mortgage was foreclosed, offered expert testimony tending to show that if the houses mentioned in the bond had been completed as agreed in the bond, on July 1st, 1899, the plaintiff would have had ample security for its mortgage and would have suffered no loss but that the houses in an uncompleted condition were not saleable and in their condition, as shown by the testimony, on July 1st, 1899, and at the times when released, were not ready for the market or for sale and were not saleable. And that in the opinion of the expert, the houses were mortgaged by Metzbower for more than they were worth.

Wade had undertaken to do two entirely distinct things.

1st. To pay the appellee the sum of $3,500 with interest, according to certain terms agreed upon, pledging as security for such promise nineteen unfinished houses.

2nd. To complete these houses by July 1st, 1899.

These two contracts are distinct and separate. They were embodied in separate paper-writings. The defendant was surety of the latter contract, the contract for the completion of the houses. It was under no liability to the plaintiff under the first contract. That was a transaction solely between Wade and the plaintiff. It had no interest therein and it was under no obligation to see to its fulfillment. The non-payment of interest or the non-performance of any of the mortgage covenants could not by any possibility or by any breadth of construction have made it liable to the plaintiff. Its obligation stands out clearly defined to complete the houses mentioned in the bond by July 1st, 1899, and it being practically a concession in the case that the houses were not completed by that time, its liability to the plaintiff became fixed as of that date and from that time limitations began to run in its favor, while as a matter of fact, the covenants in the mortgage were observed and the mortgage was kept in good standing as late as July, 1900, a year later.

A bond identical in form with that sued upon in this case was before this Court in the case of *Schaeffer* v. *Bond*, 72 Md. 506. The facts in that case are as similar to those in this as the terms and conditions of the two bonds.

Suppose the houses being uncompleted at the time mentioned in the bond, that is July 1st, 1899, the Bonding Company tendered to the mortgagee the amount of the mortgage with 6 per cent interest, could the Bonding Company require the mortgagee as a matter of *legal right*, to deliver up its mortgage security and thus cancel and extinguish its investment? Could not the mortgagee have said with perfect propriety that the Bonding Company had nothing whatever to do with the mortgage, that its contract was to cause the houses to be completed free and clear of mechanics' lien

claims and it could have refused to assign its mortgage and thus lose the benefit of its investment?

The mortgage therefore covering the nineteen lots mentioned in the bond was not guaranteed by the defendant. It was not therefore held for its benefit and hence it is not entitled to be subrogated to the defendant's right in respect thereto and the releasing of any of the mortgaged property did not release the surety from his entirely distinct contract for the completion of the buildings or its liability for the default which had occurred by reason of the houses not being completed by July 1st, 1899. *Schaeffer* v. *Bond*, 72 Md. 507.

The principle that the releasing of securities only releases the surety when he is entitled to be subrogated to such securities is fully recognized in the following cases. *McShane* v. *Howard Bank*, 73 Md. 156; *Flannery* v. *Utley*, 3 S. W. Rep. 413 and 414; *Stafford* v. *New Bedford Bank*, 132 Mass. 317; 24 *Amer. & Eng. Ency.*, 198, 1st ed. And even in those cases where the right of subrogation exists the surety is only released to the extent that he has been injured, the claim against the surety being only *pro tanto* impaired.

If the appellee held the mortgage under an agreement entered into before the making of the loan and before the execution of the bond, the appellant (if he had any rights whatever in connection with the assignment of mortgage) could only require the appellee to hold and deal with said assignment of mortgage in the manner and under the agreements, terms and conditions whereby he held it, and if the appellee has dealt with the assignment of mortgage in accordance with such agreement made as aforesaid, the appellant has no just ground of complaint and is not in a position to say that the appellee released it when it did that which it was under obligation to do.

The question as to whether such agreement existed and as to whether it was entered into prior to said assignment of mortgage and before the execution of the bond and whether said houses were released in accordance with said agreement, were all fairly submitted to the jury under the plaintiff's fourth prayer.

There was no duty incumbent upon the appellee to break any contract with Wade in order to help the defendant out of a contract which it had broken by not seeing that the houses were completed by July 1st, 1899. The surety is not such a "favored debtor" in the eye of the law, as to entitle it to insist that the creditor should break its existing contracts in order to protect said surety from its own default. The appellee simply acted in good faith and kept a binding contract with Wade, by doing what it did and certainly by doing that which it was legally and morally bound to do, it did not release the appellant.

We have a case of a defaulting surety complaining of a creditor who was not willing to default on its honest agreements. While a surety is entitled to this right of subrogation (but it is contended that this is not a proper case to enforce such a right) it is equally true that he cannot stand in a better or higher position than the creditor. *Colvin* v. *Owens*, 32 Ala. 794.

Securities as used in this connection, namely, that of subrogation, signifying property in the lawful control of the creditor which he may rightfully retain and apply to the satisfaction of the debt without subjecting himself to an action. 27 *Am. & Eng. Ency.* (2 ed.), 518.

If the creditor is bound by an independent contract entered into before the relation of suretyship is formed or at the time when new security is taken, to surrender or substitute the same, he may do so without discharging the surety. 27 *Am. & Eng. Ency.* (2 ed.), 519.

It would be a fraud upon the part of the creditor not to cancel or release the same under such circumstances. *Pearl* v. *Cortwright*, 81 Miss. 307.

In performing its agreement in respect to the collateral security the plaintiff simply observed its legal duty and violated no duty it owed the surety. *First National Bank* v. *Johnson*, 65 Vt. 388.

"While it is a general principle that a discharge by a creditor of securities for a debt held by him, without the consent

AM. BONDING CO. vs. LOAN ASS'N.     331

Md.]                    Argument of Counsel.

of the surety for said debt, discharges the surety to the extent of the value of the securities, yet a creditor may have taken such securities under an arrangement with the debtor which binds him in good faith, to discharge therein." "A discharge by a creditor of securities so held, without notice to the surety * * * does not necessarily discharge the surety." *Pearl Street Society* v. *Imlay,* 23 Conn. 10.

That the defendant was not entitled to the benefit of the mortgage security, is shown by the Schaeffer case and other cases cited. And nowhere in the record is there the slightest hint or suggestion that any change or alteration, material or otherwise was made in the contract guaranteed by the defendant. The time for the building of the houses had not been extended nor the conditions of the bond changed in any particular.

After the liability of the defendant had become fixed, the principle creditor could to do with its security as its judgment dictated, so long as it acted in good faith." *Schaeffer* v. *Bond,* 72 Md. 508; *Kohler* v. *Matlage,* 72 N. Y. 268. Even where the contract upon which the surety is bound, has been materially changed or altered, the surety is not released if such changes or alterations were made after default in the surety's bond had occurred and his liability to the creditor had become fixed.

"Even if there had been proof of a valid contract for extension of the time of payment of the bond * * * on which the appellant was guarantor, yet if that agreement had been entered into, after the date of the maturity of the bond, it would be inoperative to discharge the guarantor * * * To give to such an agreement that effect, *it must be made before the maturity of the bond."* *Hayes* v. *Wells,* 34 Md. 512–515; *Lake* v. *Thomas,* 84 Md. 623.

But even where the surety is entitled to be subrogated to the securities held by the principal creditor, as he is not in this case, the creditor can always show that what was done with the securities did not injure the surety, but saved it from greater loss or injury in its undertaking. The whole ques-

tion is was the surety injured by what was done with the securities, and this is a question of fact for the jury.   To the extent of such injury to the surety, the creditor has impaired his claim against him.   Of course this is where the surety is entitled to the benefit of the securities which we deny under the terms of the defendant's bond, sued on in this case.   *Freaner* v. *Yingling*, 37 Md. 496: *Third Natl. Bank* v. *Shields*, 55 Hun. N. Y. 277; *Kohler* v. *Matlage*, 72 N. Y. 268; *Pettingill* v. *Moss*, 3 Minn. 222.

It can be shown that the release of part of security is an improvement or benefit instead of loss to creditor.   *Neff's Appeal*, 9 W. & S. (Pa.) 43 and 44.   Any act not injuring the surety does not discharge him as where creditor has judgment and notes and assigns judgment.   *State Bank* v. *Smith*, 155 N. Y. 201.   And as where creditor has levy under judgment and releases levy, which is shown to be of benefit to the surety.   *Thomas* v. *Cleveland*, 33 Mo. 127.   Surety is only released to the extent that he is actually injured.   *Saline Co.* v. *Buie*, 65 Mo. 65.

BOYD, J., delivered the opinion of the Court.

This is a suit on a bond given by Wm. A. Wade and the appellant to the appellee in the penalty of $3,500.  It recites in the preamble that Wade, by an assignment of a mortgage of even date, had granted and conveyed unto the appellee all those nineteen pieces or parcels of ground described in said assignment, and that it was a condition precedent to said assignment that the appellee should be saved and protected against loss in the premises by the execution of that bond of indemnity.   The part of the condition of the bond with which we are concerned is "that if the said William A. Wade, assignor of said mortgage, shall fully complete and finish the buildings and improvements now in course of erection on said respective lots of ground, fence in said lots, lay the pavements and put the ground and premises in complete order for occupancy by tenants on or before the first day of July next."   It then proceeds to state the manner in which they are to be completed

by referring to houses on certain streets in Baltimore. The condition of the bond also provides that the appellant should indemnify the appellee against mechanics' liens, but that is not involved in this case, and no breach is alleged in the declaration as to it. A number of pleas and replications were filed, many of which were demurred to, but as the demurrers were for the most part decided against the appellee, it will not be necessary to consider them separately, especially as the important questions will be passed on in the consideration of the prayers. The Court granted the second, third, fourth and fifth prayers of the plaintiff and rejected all of the five prayers offered by the defendant. The defendant excepted to the rulings of the Court as to these prayers and to the overruling of its special exceptions to the second, third and fourth prayers of the plaintiff. A verdict was rendered in favor of the plaintiff for $950.66, and this appeal was taken from the judgment on that verdict.

The assignment of the mortgage by Wade to the appellee was to secure $3,500 loaned to him by it, and seems to contain the usual covenants in a building association mortgage, but it is not set out in full in the record. The mortgage assigned was from one Carter to Wade to secure a loan of $7,300, payable in one year, and conveyed the nineteen lots. It does not provide for partial payments, but Wade and the appellee agreed that upon payment of one-nineteenth of the debt due it, the appellee would release a lot. It accordingly released one lot on payment of $170.10 and eight on each of which was paid $168.10, all of which amounts were credited on the debt due the appellee. The releases were not made until after July 1st, 1899, the time the appellee contends there was default on the bond sued on. The appellant was not notified that the releases were to be made, and contends that it has suffered by reason thereof to the full amount of the penalty of the bond. The mortgage was foreclosed as to the remaining ten lots which only realized $110 each, amounting in all to $1,100, and the auditor's account showed the balance due the appellee to be $950.66. The loan was granted Wade that upon the condition that this bond should be given.

It is contended by the appellant that the bond sued on is a guaranty of the mortgage debt.   The language of the under-taking quoted above would seem to show clearly that that contention is not correct.   If the buildings and improvements, had been completed on or before July 1st, then manifestly the bond would not have been liable, if there had been default on the mortgage, and the property had realized less than the amount due the appellee by Wade.   Presumably the appellee felt satisfied to loan Wade $3,500 on the security of the as-signment of the mortgage, provided the buildings and im-provements were completed by the first day of July and were clear of liens, but however that may be, if, for example, the improvements had been completed by July 1st, and had been destroyed by fire, certain it is that the appellant could not have been held responsible for any loss, if the insurance had not been kept up, or the amount of the policy could not be collected by reason of the failure of the insurance company, or other cause not occasioned by the appellant.   The learned counsel for the appellant argued that the measure of damages on the bond was not what it would cost to complete the build-ings, but the loss on the mortgage debt.   It is true that if there had been no loss on the mortgage debt, there could be no recovery on the bond for the very simple reason that the appellee would have lost nothing, and therefore would not have been entitled to recover anything, and unless it did lose some portion of the debt by reason of its debtor failing to do that which the Bonding Company had agreed to hold itself liable for, then manifestly there can be no recovery against the appellant.  What it did hold itself liable for, in our opinion, is stated above.   But that question is conclusively settled by the case of *Schaeffer* v. *Bond*, 72 Md. 501.   Mrs. Schaeffer loaned one John Carson $4,500, who gave her a mortgage on eleven parcels of land in Baltimore City.   On the same day the mortgage was given, Carson executed a bond with secu-rities, which recited that it was a condition precedent to making the loan that the bond was to be given.   The condition of that bond was in the same language used in the one now be-

fore us, as to the completion of improvements and the liens, and also included indemnity against ground rent. This Court said "It is universally accepted law that sureties are only to be held to the letter of their contract; and their liability is not to be enlarged beyond their strict engagement. *Brandt on Suretyship,* sec. 79. Looking to the bond of John Carson and his securities, to Mrs. Schaeffer, it very clearly appears that *the securities never undertook to be sureties for the mortgage debt, nor any part of it. No default in respect to it, or anything which affected the mortgage debt, brought any liability on them for it.* Their undertaking was purely collateral to it. They became security that the buildings mortgaged should be completed by a specified time; for the fencing and paving of the premises; for the payment of the ground rent; and that Mrs. Schaeffer should suffer no loss by reason of mechanic's liens on the property. None of these are mentioned in the mortgage except the rent. The mortgage gives no hint that the buildings mentioned in it are uncompleted structures." We do not see any distinction between that case and the one now before us that can in any way affect the question. The fact that the title to the property was in Carter can make no difference. Wade furnished the money for the building of the houses, took the mortgage from Carter which was assigned to the appellee, and was virtually the owner of the property.

The evidence shows that the appellee entered into the agreement with Wade, as a condition precedent to the loaning of the money, and before the execution of the assignment of the mortgage, to release each lot upon the payment of one-nineteenth of the debt. Nine of them were accordinly released as stated above, and the sums received were credited on the mortgage. That agreement was not embodied in the assignment of the mortgage and was not communicated to the appellant. All of the payments were made and the releases were executed after July 1st, 1899—the first being nearly four months thereafter. It is not denied, but practically conceded, that none of the houses were completed by that date, and, as we have said the undertaking by the appellant was that they

should be completed by that time, it follows that the appellee was entitled to recover, if he did sustain any loss by reason of the improvements not being so completed. Each of the prayers granted by the Court required the jury to find the latter fact before finding for the plaintiff. The *fifth* was the only one that instructed the jury as to the amount of recovery, which told them "that if they find for the plaintiff, they shall award the plaintiff such sum as they may find from the evidence the plaintiff lost under the said assignment of mortgage by reason of the non-completion of said houses, according to the terms of the bond proven in this case." Wade, and not the appellee, was the one who procured the appellant to go on the bond. Mr. Carrington, atttorney for the appellee, testified that some one representing the appellant telephoned to his office that Mr. Wade had applied for the bond for the completion of the buildings, and if he would prepare it in such form as he desired and send it to the company, it would execute the bond for Mr. Wade. A few days afterwards Mr. Wade obtained the blank bond, took it to the appellant, and on the day of the final consummation of the loan, and the payment of the money, it was returned to Mr. Carrington's office by Mr. Wade. It is not proven in the case that Mr. Carrington knew that there was an agreement to accept partial payments and execute releases when he drew the bond, but, if that be assumed, the appellant did not occupy such relation to the mortgage as to enable it to escape its liability, because the appellee executed the releases on payment of the amounts agreed upon, in accordance with its promise so to do. In *Schaeffer* v. *Bond, supra,* three of the houses included in the mortgage were destroyed by fire shortly after default in the bond. They were insured as required by the mortgage "with provision in the policy for the payment of the insurance money, in the event of fire, to the mortgagee" and $2,469.18 was paid by the insurance company. The bill in that case alleged that that sum was properly applicable to the discharge of the obligation of the mortgagor to the mortgagee, but without the assent or concurrence of the appellees, who were sure-

ties on the bond, Mrs. Schaeffer made an agreement with the mortgagor and others by which the insurance money was applied to the rebuilding of the houses, the time was extended for the completion of them and a builder entered into a bond to complete them by May 1st, 1888.  This Court, after saying what we have quoted above, added "Not being securities for the mortgage debt these securities had no interest in the insurance money, or right to demand its application to the payment of the mortgage debt.  All controversy, therefore, over the propriety of the application of the insurance money to the restoration of the burnt buildings is wholly eliminated. It is very certain that what was done with the insurance money wrought no injury to them, but must have benefited them to some extent."  Mrs. Schaeffer could have repaid herself more than half of the mortgage debt ($4,500) with the money received from the insurance on the three houses which were burned, but instead of doing that she allowed the money to be used to restore the property to the condition it was in before the fire, and it must be remembered that she was entitled to the money under the terms of the mortgage, in case of loss by fire.  But this Court held that she did not by her act in reference to the insurance money release the sureties on the bond.  If they had been sureties for the payment of the debt secured by the mortgage, the decision of the Court would, under the law applicable to suretyship, have been different, for the sureties would then have been entitled to demand the application of the insurance money to the payment of the mortgage debt, as the insurance was intended as security for that debt, but as they were not such sureties they had no right to require that of her.  It is true that she required the money to be applied to the restoration of the property, but in the case now before us, the proof is that all of the money received from the properties that were released was used on the nineteen houses included in the mortgage and bond, over and above what was paid on the mortgage.  Over $1,500 was paid on the mortgage, under the agreement for the releases, and a large amount was paid on the dues as shown by the witness

Metzbower who had charge of the matter for Wade. The same witness testified that considerable portion of the money so received was used in paying those working on the properties (and such persons might have filed mechanic's liens) and for the completion of the houses. The bond had been in default for about four months before any house was released, and was still in default when the last release was given, which was over ten months after July 1st. Default was not made on the mortgage until July, 1900, and therefore the appellee could not take steps to foreclose it until that time, and when it was foreclosed the ten remaining houses were still unfinished and only realized $1,100. Carter testified it would have cost $1,600 to complete the ten houses, when he stopped work on them in May, 1900. The uncontradicted evidence also shows that by reason of the incomplete condition of the houses on July 1st, 1899, they could not be sold for anything like what they would have been worth if completed. The only real estate expert who testified said that the houses were practically unsalable unless completed. Sometime in the latter part of 1899 or in the early part of 1900, the Maryland Loan and Building Association failed. It had about three hundred houses in this neighborhood which were put on the market, and in the language of Mr. Metzbower "knocked the bottom clear out of our houses."

We have thus at length referred to the testimony showing the conditions existing at the time of the default by Wade, for which the appellant had made itself responsible by the bond. It conclusively shows that the default did materially affect the value of the property included in the mortgage, that the appellant took no steps to remedy the trouble, and that it required somewhat strenuous efforts to save something out of the wreck. Carter had no means and was entirely dependent upon Wade. The latter's means were exhausted and the only way anything could be realized was to complete a house, then secure a loan on it in some way, and use that in completing other houses. Mr. Metzbower said that it was only through his friends that they were able to realize what they did, and

Mr. Merriken, a real estate broker, testified that the properties were not worth as much as Metzbower succeeded in getting on them.  Carter was finally forced into bankruptcy and Wade soon followed.  The record does not show the exact amount that was credited on the mortgage out of the money realized from the buildings, but it must have been a half or more of the mortgage debt, as Metzbower mentioned payments on account of dues amounting to over $650 that were made out of the proceeds from the houses, in addition to over $1,500 paid for the releases.  He did not show how much of the dues was applied to the principal, and we have no definite information on that subject, but when it is remembered that Wade's default, for which appellant was responsible, caused the great loss to the appellee's security, and required prompt measures to avoid still greater loss, it cannot be said, as the defendant's *fourth* prayer asked the Court to instruct the jury, that there was no evidence legally sufficient to show that the releases saved the defendant from a greater loss than it would otherwise have suffered, or that there was no evidence to show that the releasing of the property did not injure the defendant or cause it loss, as the special exception to the plaintiff's *third* prayer alleged.  Nor could the Court, in view of Mr. Metzbower's evidence, sustain its exception to the plaintiff's *second* prayer which alleged there was no evidence to show that the money derived from the property released was applied towards the completion of the houses, and that the releases did not injure the defendant.  This last-mentioned exception did not state all that the prayer submitted, as it also referred to "the expenses on said property, and making partial payments on said mortgage."

The defendant also filed a special exception to the plaintiff's fourth prayer "because there is no evidence to show that the plaintiff did not procure the execution of the bond, and was not present when the bond was executed."  Mr. Carrington's testimony certainly tended to show those facts.  The only thing that could in anywise reflect upon the appellee's conduct in reference to the bond is the fact that neither the

340    AM. BONDING CO. vs. LOAN ASS'N.

Opinion of the Court.      [101

assignment of the mortgage, nor the mortgage, provided for partial payments and releases. In a case where the relation of creditor and surety confessedly existed, this Court said: "A creditor is not bound in the absence of inquiries from the sureties to communicate to them all the circumstances that may affect their undertaking." *Lake* v. *Thomas*, 84 Md. 608. If the appellant had been a surety for or guarantor of the mortgage debt, it would therefore be at least doubtful whether it would have been incumbent on the appellee either to insert a provision for the partial payments and releases in the assignment, or to inform the appellant in the absence of some allegation and proof of fraud, but as it was neither, and only became responsible for the completion of the buildings by July 1st, we find nothing in the record that required the appellee to do more than was done by it, in order to recover such damages as it sustained by reason of the houses not being completed by the time agreed upon. As the appellant was not a surety for, or guarantor of the mortgage debt, it was not entitled to the benefit of the mortgage any more than the sureties in the Schaeffer case were to the insurance money. All it could require of the appellee was to deal fairly and justly with it, and not improperly increase its liability for the default in not completing the improvements. As the appellee had agreed to release each house on payment of its proportion of the mortgage debt it would have been unfair to Wade not to do so—certainly unless it had reason to believe Wade was thereby imposing upon the appellant, which is not shown, or even alleged in the pleadings, to have been the case. One of the qualifications to the doctrine in reference to the impairment of a lien, even between a creditor and a surety of the debt thereby secured, is thus stated in 27 *Am. & Eng. Ency. of Law* (2 ed.) 519. "If the creditor is bound by an independent contract entered into before the relation of suretyship is formed, or at the time when new security is taken, to surrender or substitute the same, he may do so without discharging the surety." The following cases are there cited: *Pearl* v. *Cortright*, 81 Miss. 300; *Fair Haven Bank* v. *Johnson*, 65 Vt.

PHIL., B. & W. R. CO. vs. DEVERS.    341

Md.]                    Syllabus.

382; *Pearl St. Cong. Soc.* v. *Inlay*, 23 Conn. 10. · It will be seen that those cases go very far in support of that statement, but inasmuch as that relation does not exist in this case, in so far as the mortgage debt is concerned, it is not necessary to dwell longer on that subject.

The fourth prayer required the jury to find amongst other things "that the plaintiff suffered loss by reason of said houses not being completed in accordance with the terms of said bond." That by itself might possibly be somewhat misleading, but the other prayers of the plaintiff which were granted required the jury to find that the releases enabled Carter and Wade to procure funds with which to complete the houses, that the money thus obtained was so applied, and that the releases did not injure the defendant, but saved it from loss. The appellant, therefore, had no reason to complain of the prayers granted by the Court when taken together, and the appellee assumed the burden of proving some facts which it was not called upon to assume, in the absence of proof of fraud or some improper treatment of the appellant by it.

As it would serve no good purpose to further discuss the prayers, or the rulings on the demurrers, we will not do so, but for the reasons we have given will affirm the judgment.

*Judgment affirmed, the appellant to pay the costs.*

(Decided June 21st, 1905.)